CLYDE & CO US LLP
200 Campus Drive
Suite 200
Florham Park, N.J. 07932-0950
(973) 210-6700
Attorneys for Plaintiff, Super 8 Worldwide, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUPER 8 WORLDWIDE, INC., a South Dakota Corporation, | : |
| | : |
| Plaintiff, | :   Civil Action No. 13- |
| | : |
| v. | : |
| | : |
| SAINATH LLC, an Alabama Limited Liability Company; AMIT PATEL, an individual; AJIT PATEL, an individual; and BHAVIN PATEL, an individual, | :     **COMPLAINT** |
| | : |
| Defendants. | : |
| | : |

Plaintiff Super 8 Worldwide, Inc., by its attorneys, Clyde & Co US LLP, complaining of defendants Sainath LLC, Amit Patel, Ajit Patel and Bhavin Patel, says:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Super 8 Worldwide, Inc. ("SWI"), is a corporation organized and existing under the laws of the State of South Dakota, with its principal place of business in Parsippany, New Jersey.

2.      Defendant Sainath, LLC ("Sainath"), on information and belief, is a limited liability company organized and existing under the laws of the State of Alabama, with its principal place of business at 1813 Crestwood Boulevard, Irondale, Alabama 35210.

3.      Defendant Amit Patel ("Amit Patel"), on information and belief, is a principal of Sainath and a citizen of the State of Alabama, residing at 1813 Crestwood Boulevard, Irondale, Alabama 35210.

4.      Defendant Ajit Patel ("Ajit Patel"), on information and belief, is a principal of Sainath and a citizen of the State of Pennsylvania, residing at 5212 Inlet Drive, Bensalem, Pennsylvania 19020.

5.      Defendant Bhavin Patel ("Bhavin Patel"), on information and belief, is a principal of Sainath and a citizen of the state of Alabama, residing at 1813 Crestwood Boulevard, Irondale, Alabama 35210.

6.      Upon information and belief, Amit Patel, Ajit Patel and Bhavin Patel are the only constituent members of Sainath.

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and all the defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

8.      This Court has personal jurisdiction over Sainath by virtue of, among other things, section 17.6.3 of the September 30, 2009 franchise agreement by and between Sainath and SWI (the "Franchise Agreement"), described in more detail below, pursuant to which Sainath has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

9.     This Court has personal jurisdiction over Amit Patel, Ajit Patel and Bhavin Patel by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which Amit Patel, Ajit Patel and Bhavin Patel acknowledged that they were personally bound by section 17 of the Franchise Agreement.

10.     Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by Sainath of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Agreements Between The Parties

11.     On or about September 30, 2009, SWI entered into the Franchise Agreement with Sainath for the operation of a 44-room[1] guest lodging facility located at 6220 McClellan Boulevard, Anniston, Alabama 36206, Site No. 08129-87934-02 (the "Facility").  A true copy of the Franchise Agreement is attached hereto as Exhibit A.

12.     Pursuant to section 5 of the Franchise Agreement, Sainath was obligated to operate a Super 8® guest lodging facility for a twenty-year term.

13.     Pursuant to section 7 and Schedule C of the Franchise Agreement, Sainath was required to make certain periodic payments to SWI for royalties, system assessments, taxes, interest, reservation system user fees, annual conference fees, and other fees (collectively, "Recurring Fees").

---

[1] The parties revised the number of guest rooms Sainath was authorized to operate to 42 on or about May 10, 2010.

14.     Pursuant to section 7.3 of the Franchise Agreement, Sainath agreed that interest is payable "on any past due amount payable to [SWI] under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

15.     Pursuant to section 3.6 of the Franchise Agreement, Sainath was required to prepare and submit monthly reports to SWI disclosing, among other things, the amount of gross room revenue earned by Sainath at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to SWI.

16.     Pursuant to section 3.6 of the Franchise Agreement, Sainath agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Sainath agreed to allow SWI to examine, audit, and make copies of the entries in these books, records, and accounts.

17.     Pursuant to section 9 of the Franchise Agreement, Sainath could not lease the Facility, nor engage in any change, assignment, transfer, conveyance, or pledge of its interest, except with SWI's prior written consent.  Any attempted transfer, assignment, conveyance, or pledge not in accordance with section 9 of the Franchise Agreement would be void as between SWI and Sainath, and would give SWI the right to terminate the Franchise Agreement.

18.     Pursuant to section 11.2 of the Franchise Agreement, SWI could terminate the Franchise Agreement, with notice to Sainath, if Sainath (a) discontinued operating the

Facility as a Super 8® guest lodging establishment and/or (b) lost possession or the right to possession of the Facility.

19.     Pursuant to section 12.1 of the Franchise Agreement, Sainath agreed that, in the event of a termination of the Franchise Agreement pursuant to section 11.2, it would pay liquidated damages to SWI in accordance with a formula specified in the Franchise Agreement.

20.     Pursuant to section 17.4 of the Franchise Agreement, Sainath agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

21.     Effective as of the date of the Franchise Agreement, Amit Patel, Ajit Patel and Bhavin Patel provided SWI with a Guaranty of Sainath's obligations under the Franchise Agreement.  A true copy of the Guaranty is attached hereto as Exhibit B.

22.     Pursuant to the terms of the Guaranty, Amit Patel, Ajit Patel and Bhavin Patel agreed, among other things, that upon a default under the Franchise Agreement, they would "immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the [Franchise] Agreement."

23.     Pursuant to the terms of the Guaranty, Amit Patel, Ajit Patel and Bhavin Patel agreed to pay the costs, including reasonable attorneys' fees, incurred by SWI in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

<u>The Termination of the Franchise Agreement</u>

24.     On or about April 18, 2012, Sainath relinquished control of the Facility, without prior consent from SWI, to a third party.

25.     By letter dated June 28, 2012, a true copy of which is attached as <u>Exhibit C</u>, SWI acknowledged Sainath's unilateral termination the Franchise Agreement and advised Sainath that it was required to pay to SWI as liquidated damages for premature termination the sum of $84,000.00 as required under the Franchise Agreement, and all outstanding Recurring Fees through the date of termination.

## **FIRST COUNT**

26.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 25 of the Complaint.

27.     Pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Sainath agreed to allow SWI to examine, audit, and make copies of Sainath's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

28.     The calculation of the monetary amounts sought by SWI in this action is based on the gross room revenue information supplied to SWI by Sainath and, to the extent there has been non-reporting, SWI's estimate as to the gross room revenue earned by Sainath.

29.     The accuracy of this estimate cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Sainath.

**WHEREFORE**, SWI demands judgment ordering that Sainath account to SWI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility from the inception through the date of termination of the Franchise Agreement.

## SECOND COUNT

30.    SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 29 of the Complaint.

31.    By letter dated June 28, 2012, SWI acknowledged Sainath's unilateral termination of the Franchise Agreement.

32.    Section 12.1 of the Franchise Agreement provides that, in the event of termination of the Franchise Agreement due to action of the Franchisee, Sainath shall pay liquidated damages to SWI within 30 days of termination.

33.    As a result of the termination of the Franchise Agreement, Sainath is obligated to pay SWI liquidated damages in the amount of $84,000.00, as calculated pursuant to section 12.1 of the Franchise Agreement.

34.    Notwithstanding SWI's demand for payment, Sainath has failed to pay SWI the liquidated damages as required in section 12.1 of the Franchise Agreement.

35.    SWI has been damaged by Sainath's failure to pay liquidated damages.

**WHEREFORE**, SWI demands judgment against Sainath for liquidated damages in the amount of $84,000.00, together with interest, attorneys' fees, and costs of suit.

### THIRD COUNT

36.    SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 35 of the Complaint.

37.    By virtue of the premature termination of the Franchise Agreement, SWI sustained a loss of future revenue over the remainder of the twenty-year term of the Franchise Agreement.

38.    If the Court determines that Sainath is not liable to pay SWI liquidated damages as required by section 12.1 of the Franchise Agreement then, in the alternative, Sainath is liable to SWI for actual damages for the premature termination of the Franchise Agreement.

39.    SWI has been damaged by Sainath's breach of its obligation to operate a Super 8® guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, SWI demands judgment against Sainath for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

### FOURTH COUNT

40.    SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 39 of the Complaint.

41.    Pursuant to section 7 and Schedule C of the Franchise Agreement, Sainath was obligated to remit Recurring Fees to SWI.

42. Despite its obligation to do so, Sainath failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $103,438.65.

43. Sainath's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and has damaged SWI.

**WHEREFORE**, SWI demands judgment against Sainath for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $103,438.65, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

44. SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 43 of the Complaint.

45. At the time of the termination of the Franchise Agreement, Sainath was obligated to pay SWI Recurring Fees.

46. Despite its obligation to do so, Sainath failed to pay certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $103,438.65.

47. Sainath's failure to compensate SWI constitutes unjust enrichment and has damaged SWI.

**WHEREFORE**, SWI demands judgment against Sainath for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $103,438.65, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

48.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 47 of the Complaint.

49.     Pursuant to the terms of the Guaranty, Amit Patel, Ajit Patel and Bhavin Patel agreed, among other things, that upon a default under the Franchise Agreement, they would immediately make each payment and perform each obligation required of Sainath under the Franchise Agreement.

50.     Despite their obligation to do so, Amit Patel, Ajit Patel and Bhavin Patel have failed to make any payments or perform or cause Sainath to perform each obligation required under the Franchise Agreement.

51.     Pursuant to the Guaranty, Amit Patel, Ajit Patel and Bhavin Patel are liable to SWI for Sainath liquidated damages in the amount of $84,000.00, or actual damages in an amount to be determined at trial, and Sainath's Recurring Fees due and owing under the Franchise Agreement, in the current amount of $103,438.65.

**WHEREFORE**, SWI demands judgment against Amit Patel, Ajit Patel and Bhavin Patel for damages in the amount of all liquidated damages or actual damages and Recurring Fees due and owing under the Franchise Agreement, together with interest, attorneys' fees, and costs of suit.

CLYDE & CO US LLP
Attorneys for Plaintiff,
Super 8 Worldwide, Inc.

By:_____
       **BRYAN P. COUCH**

Dated: 6|11|13

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other

action pending in any court or of any pending arbitration or administrative proceeding.

CLYDE & CO US LLP
Attorneys for Plaintiff,
Super 8 Worldwide, Inc.

By:_____
       **BRYAN P. COUCH**

Dated: 6|11|13

- 11 -

# EXHIBIT A

Location:   Anniston, AL
Entity No.:   87934-02
Unit No.:   8129

## SUPER 8 WORLDWIDE, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated _9 – 30_, 200_9_, is between SUPER 8 WORLDWIDE, INC., a South Dakota corporation ("we", "our" or "us"), and SAINATH LLC, an Alabama Limited Liability Company ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1.   Franchise.**   We have the exclusive right to franchise to you the distinctive "Super 8" System for providing transient guest lodging services. We grant to you and you accept the Franchise, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The Franchise is effective only at the Location and may not be transferred or relocated. You will call the Facility a "Super 8" and you may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2.   Protected Territory.**   We will not own, operate, lease, manage, franchise or license anyone but you to operate a Chain Facility of the same name (Super 8) in the "Protected Territory", defined in Appendix A, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise (i) any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate franchises or licenses the facility, and/or (ii) any time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located with the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminated or is not renewed. You acknowledge that the Protected Territory fairly represents the Facility's trading area and that there are no express or implied territorial rights or agreements between the parties except as stated in this Section. You irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the

1

Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only.

**3.     Your Improvement and Operating Obligations.**

3.1     **Pre-Opening Improvements.**  You must select, acquire, construct and/or renovate the Facility as provided in Schedule D.

3.2     **Operation.**  You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with all federal, state and local laws, regulations and ordinances as well as System Standards.  You will not operate a Food and Beverage service without our prior written consent, except for a complimentary coffee service/continental breakfast in accordance with System Standards.  If you do not manage the Chain Facility personally, you must employ a full-time general manager who will be dedicated solely to the Facility.  You will keep the Facility in a clean, neat, and sanitary condition.  You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual.  The Facility will follow standard industry practices for safeguarding cardholder information, applicable laws and regulations, and such other requirements as we may include in the System Standards Manual or as we may otherwise communicate from time to time for such purpose.  You may add to or discontinue the amenities, services and facilities described in Schedule B, or to lease or subcontract any service or portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay.  Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.  You acknowledge that any breach of System Standards for the Facility, its guest amenities, and your guest service performance is a material breach of this Agreement.

3.3     **Training.**  You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for franchisees and general managers, respectively.  You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement.  You will pay all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.4     **Marketing.**

3.4.1   You will participate in System marketing programs, including the Directory, if any, the Reservation System, and guest loyalty programs.  You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System.

2

You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants.  You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards.  You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication.  You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.4.2   You will participate in any regional marketing, training or management alliance or cooperative of Chain franchisees formed to serve the Chain Facilities in your area.  We may assist the cooperative collect contributions.  You may be excluded from cooperative programs and benefits if you do not participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.4.3  The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs, including any arrangements with third party distribution channels that are mandated in the System Standards Manual. You shall provide us with information about the Facility and utilize our approved photographer for taking photographs of the Facility for posting on the Chain website. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary.  You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards.  You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities.  You must honor the terms of any participation agreement you sign for Internet marketing.  You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis.  We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3.4.4  You will participate in any guest rewards or loyalty program we determine is appropriate and pay the Loyalty Program Charge associated with the program as set forth in Schedule C.

3.5    **Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote.  You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.  You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.6    **Financial Books & Records; Audits.**

3.6.1  The Facility's transactions must be timely and accurately recorded in accounting books

3

and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Sales is a material obligation you accept under this Agreement.

3.6.2   Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards. We may notify you of a date on which we propose to audit the Facility's books and records at the Facility. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.6.3   We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.6.2 within 30 days after the date of the initial audit, (ii) you cancel two (2) or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Sales for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.6, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees, any Audit Fee we assess you for your default of Section 3.6 as described in Section 4.8, and/or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Sales you reported to us during the fiscal year fairly present the Gross Room Sales of the Facility computed in accordance with this Agreement for the fiscal year.

3.6.4   You shall, at your expense, prepare and submit to us by the tenth day of each month, a statement in the form prescribed by us, accurately reflecting for the immediately preceding month all Gross Room Revenues and such other data or information as we may require. You must submit your statements to us using our on-line reporting and payment tool or through such other technology or means as we may establish from time to time.

3.7   **Inspections.**   You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance

4

inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in System Standards Manuals plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. You will also be charged the Reinspection Fee if we are required to return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the Punch List, as set forth in Schedule D. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys. We may, at our discretion, implement a chain-wide quality assurance/mystery shopper inspection program to be performed by a reputable third party. You will pay the cost of the third party inspection when invoiced for no more than two inspections in any calendar year.

3.8    **Insurance.**  You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Super 8 Worldwide, Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, their current and former affiliates, successors and assigns as additional insureds.

3.9    **Conferences.**  Chain conferences are held on either a chain-wide or regional basis. You or your representative must attend each Chain conference and pay the Conference Fee we set for Chain franchisees, if and when we determine to hold a Chain conference. If you operate other lodging facilities under the System in addition to the Facility, you must send a different representative to the Chain conference and pay another Conference Fee for each facility. We will charge you and you must pay the Conference Fee even if you do not attend the Chain conference. You will receive reasonable notice of a Chain conference.

3.10    **Purchasing.**  You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks, such as signage, only from suppliers we approve. You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.11    **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Super 8" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners. You will participate in any Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities. You shall use your best efforts to promote usage of other Chain Facilities by members of the public. Except as provided in the System Standards Manual or if you obtain our

5

prior written consent, which we may withhold in our sole discretion, neither your nor the Facility shall promote or advertise any competing business at the Facility including, but not limited to, any other guest lodging facility, time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, unless we or one of our affiliates franchise, manage or own that business.

3.12   **Facility Modifications.**  You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay.  You will pay our Rooms Addition Fee then in effect for each additional guest room you may add to the Facility over 120 rooms.  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay.  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.13   **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three (3) standard guest rooms at the same time.

3.14   **Minor Renovations.**  Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 90 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount.  You will perform the Minor Renovations as and when the Minor Renovation Notice requires.  We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 200 points and the most recent quality assurance inspection score for the Facility is no more than 200 points (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

3.15 **Technology Standards & Communications.**  You recognize that the System requires you to acquire, operate and maintain a computer-based property management system and provide guests with innovative technology for communications and entertainment.  You must purchase the computer system and other equipment and software that we specify.  We may modify System Standards to require new technology at all Chain Facilities.  At our request, you shall participate in any intranet or extranet system developed for use in connection with the System.  Such intranet or extranet system may be combined with that of our affiliates.  You shall agree to such terms and conditions for the use of such intranet or extranet system as we may prescribe, which may include, among other things:  (a) confidentiality requirements for materials transmitted via such system; (b) password protocols and other security precautions; (c) grounds and procedures for our suspension or revocation of access to the system by you and others; and (d) a privacy policy governing the parties' access to and use of electronic communications posted on electronic bulletin boards or transmitted via the system.  You shall pay any fee imposed from time to time by us or a third party service provider in connection with hosting such system.

6

**4.**    **Our Operating and Service Obligations.**   We will provide you with the following services and assistance:

**4.1 Training.**   We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, remedial training and supplemental training.

**4.1.1 General Manager Orientation Training.**   We will offer at a location in the United States we designate a general manager orientation training program.   The program will not exceed two (2) weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility.   We may also offer certain Internet-based training as a supplement to the classroom training experience.   Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction before the Opening Date. Any replacement general manager must complete general manager orientation to our satisfaction no later than 90 days after he/she assumes the position. If we do not offer a place in general manager orientation within the above time frame, your replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition for general manager orientation which is payable before the scheduled date of the program.   The tuition for your first general manager is $1,250 if he/she attends orientation within the time period required under this section.   For any replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits.   We may, at our option, automatically schedule your initial or replacement general manager for a class to be held within the required time period (an "auto-assigned class") and invoice you when we notify you about the date of the class.  If your general manager is unable to attend that class, you must notify us at least 15 days before the training start date and re-schedule the general manager for another class to be held within the 90 day period. We may charge you "No-Show Fees" or "Cancellation Fees" if your general manager fails to attend orientation within the required time period or fails to attend a program we have scheduled for him or her without giving us at least 15 days notice of cancellation. This is in addition to the tuition you must pay us for your general manager at the then in effect rate when he/she attends orientation. See Section 4.1.5.

**4.1.2 Owner Training.**   We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services.   If this is your first System franchise, you (or a person with executive authority if you are an entity) must attend owner orientation preferably within 60 days before, but no later than 60 days after the Opening Date.  If we do not offer a place in owner orientation within this time period, you must attend the next program held at which we offer a place.   Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. We charge you tuition of $825 which is payable before the scheduled date for the program.   You must also pay for your travel, lodging, meal and incidental expenses. If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least 15 days

7

before the start date and schedule attendance at another class to be held within the 90 day period. We may charge you No-Show or Cancellation Fees if you fail to attend any mandatory orientation program within the required time period or fail to attend a program we have scheduled for you without giving us at least 15 days notice of cancellation. See Section 4.1.5. In addition to owner orientation, we may require first time owners to attend up to four additional courses within six months of the Opening Date. These courses will typically not exceed one day in length. Tuition for these courses is currently $250, but is subject to increase in the future.

4.1.3 **Remedial Training.**   We may require you, your general manager and/or your staff to participate in remedial training if the Facility receives a D or F (or equivalent score) on a quality assurance inspection, a D or F +GX score on Medallia electronic guest survey (or equivalent evaluation system), or experiences significant complaints to our guest services department, as determined by us in our sole discretion. This training may be offered at our corporate offices, at a regional location, on-line or at the Facility.  The training may be in the form of one or more classes held at different times and locations as we may require.  You must pay the tuition in effect for this program when it is offered to you.  If the training is provided at the Facility, you must provide lodging for our trainers.

4.1.4 **Supplemental Training.**   All general managers must complete recertification training every three years.  You must pay us the tuition then in effect for the program.  We may offer other mandatory or optional training programs for reasonable tuition or without charge. Recertification and other supplemental training may be offered in our U.S. training center or other locations or held in conjunction with a Chain lodging conference.  You must pay the then current tuition for the training as well as for your representative's travel, lodging, meals, incidental expenses, compensation and benefits while attending the training. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

4.1.5 **No Show and Cancellation Fees.**   If you or your general manager fails to attend orientation within the required time period, or fails to attend a training program as scheduled (including any auto-assigned class) without notifying us in advance, we may charge you a No-Show Fee of up to 100% of the tuition for the program. If you or any other member of your staff cancels participation in any training program less than 15 days before it is scheduled to be held, we may charge you a Cancellation Fee of up to 50% of the tuition for the program. No-Show and Cancellation Fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program.  We may assess you additional No-Show or Cancellation Fees for continued failures by you under Section 4.1.

4.2     **Reservation System.**   We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion.  We will use System Assessment Fees as specified in Schedule C, allocated in our discretion from the Advertising and Reservation Fund, for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance and support for any software we license to you to connect to the Reservation System if you are up to date in your

payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. During the Term, the Facility will participate in the Reservation System on an exclusive basis, including entering into all related technology agreements and complying with all terms and conditions which we establish from time to time for participation. The Facility may not book any reservations through any other electronic reservation system, booking engine or other technology. All information you collect or capture through your property management system shall be owned jointly by you and us. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties.

4.3     **Marketing.**

4.3.1   We will use System Assessment Fees, allocated in our discretion from the Advertising and Reservation Fund, to promote public awareness and usage of Chain Facilities by implementing appropriate international, national, regional and local advertising, promotion, publicity, market research, loyalty marketing and other marketing programs, training programs and related activities, and the production and distribution of System publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. System Assessment Fees may reimburse us or an affiliate for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement the Advertising and Reservation Fund or to advance funds to pay for System marketing activities. We do not promise that you or the Facility will benefit directly or proportionately from System marketing activities.

4.3.2   We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3   We may issue a Chain Directory in paper, electronic, or other format. We will include the Facility in this Chain Directory if (i) you submit the information we request on time, and (ii) you are not in default under this Agreement at the time we must compile the information for the Directory. If the Directory is issued in paper form, we may supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.3.4   We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for an additional fee.

4.4     **Purchasing and Other Services.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products

9

conform to System Standards.

4.5    **The System.**  We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions.  We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.  We may, in our discretion, change the designation standards for the Chain and then require that you change the designation of the Facility and related presentation of that designation where it appears.

4.6    **Consultations and Standards Compliance.**  We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct.  We will provide telephone and mail consultation on matters of Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement.  We may limit or deny access to any such website while you are in default under this Agreement.

4.7    **System Standards Manual and Other Publications.**  We will specify System Standards in the System Standards Manual, policy statements or other publications which we may make available to you via our Chain intranet, in paper copies or through another medium.  We will provide you with access to the System Standards Manual promptly after we sign this Agreement. We will notify you via our Chain intranet or another medium of any System Standards Manual revisions and/or supplements as and when issued as well as any other publications and policy statements in effect for Chain franchisees from time to time.

4.8    **Inspections and Audits.**  We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.6. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.7. You will pay us an "Audit Fee" of $1,000.00 when we invoice you for an Audit Fee under Section 3.6. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs, but not more than 5% per year on a cumulative basis. Our inspections are solely for the purposes of checking compliance with System Standards.

5.  **Term.**  The Term begins on the date that we insert in the preamble of this Agreement after we sign it (the "Effective Date") and expires at the end of the twentieth (20th) Franchise Year. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6.    **Application and Initial Fees.**  You must pay us a non-refundable Application Fee of **$1,000**.  If your franchise is for a new construction or conversion Facility, you must pay us an Initial Fee.  If you are a transferee of an existing Facility or are renewing an existing franchise, you will pay us a Relicense Fee.  The amount of your Initial or Relicense Fee is **$20,000.00** which shall be paid when you sign this Agreement and is fully earned when we sign this Agreement.

10

**7.      Recurring Fees, Taxes and Interest.**

7.1      You will pay us certain "Recurring Fees" each month of the Term payable in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States). The Royalty and System Assessment Fees described in this Section 7.1 are payable ten days after the month in which they accrue, without billing or demand. Other Recurring Fees are payable at the time set forth in the System Standards. Recurring Fees include the following:

7.1.1    A "Royalty" equal to five and five-tenths percent (5.5%) of Gross Room Sales of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2    A "System Assessment Fee" as stated in Schedule C to be paid into the Advertising and Reservation Fund, accrues from the Opening Date until the end of the Term, including during reservation suspension periods.  We may use the System Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services.  You will also pay or reimburse us as described in Schedule C "Additional Fees" such as commissions we pay to travel and other agents for certain reservations at the Facility plus a reasonable service fee, fees levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet, or other reservation systems and networks, and fees for additional services and programs. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula.  We may change, modify, add or delete the System Assessment Fee and/or Additional Fees in accordance with Schedule C.

7.2      "Taxes" are equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for our privilege of doing business in your State.  You will pay Taxes directly to us when due.

7.3      "Interest" is payable on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.  Interest is payable when you receive our invoice.

7.4      If a Transfer occurs, your transferee or you will pay us a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

7.5 We reserve the right to require you to pay all Recurring Fees and other fees and charges by electronic funds transfer (ACH) or credit card via our on-line reporting and payment tool, by direct debit of your bank account, or through such other technologies as we may establish from time to time.

**8.      Indemnifications.**

11

8.1     Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven.   You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury.   This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2     You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee.   You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest.   We must approve any resolution or course of action in a matter that could directly or indirectly have any effect on parties other than you and the complaining party in the matter, or could serve as a precedent for other matters.

8.3     We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name.   You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you.   You will cooperate with our defense and resolution of the claim.   We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9.  Your Assignments, Transfers and Conveyances.

9.1     **Transfer of the Facility.**  This Agreement is personal to you (and your owners if you are an entity).   We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you.   You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent.  If a Transfer is to occur, the transferee or you must comply with Section 9.3.   Your Franchise is subject to termination when the Transfer occurs.   The Franchise is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you

12

transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2    **Public Offerings and Registered Securities.**  You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3    **Conditions.**  We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as we reasonably determine, if the Facility achieves a score of less than "Satisfactory" on its most recent Quality Assurance inspection. We will provide a Punch List of improvements we will require after we receive the transferee's Application. We may, in our discretion, require the transferee to place funds in escrow, at its expense, in order to complete all necessary renovations. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or in, the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the Franchise when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4    **Permitted Transferee Transactions.**  You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified

in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5    **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6    **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

10.    **Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

11.    **Default and Termination.**

11.1    **Default.** In addition to the matters identified in Sections 3.1 and 3.6, you will be in default under this Agreement if: (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within 10 days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, if you have acted diligently to cure the default but cannot do so, and the default does not relate to health or safety, we may, in our discretion, enter into an improvement agreement with you provided you request such an agreement within 30 days after receiving notice of the

14

failing inspection. If we have entered into an improvement agreement, you must cure the default within the time period specified in the improvement agreement which shall not exceed 90 days after the failed inspection. We may terminate this Agreement and any or all rights granted hereunder if you do not perform that improvement agreement.

11.2   **Termination.** We may terminate this Agreement effective when we send written notice to you or such later date as required by law or as stated in the default notice, when: (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Schedule D due to your failure to perform your Improvement Obligation, (2) you discontinue operating the Facility as a "Super 8", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

11.3   **Casualty and Condemnation.**

11.3.1   You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as a transient lodging facility after the Casualty.

11.3.2   You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

15

11.3.3  The protected territory covenants in Section 2 will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

11.4  **Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default.  All Reservation System User Fees accrue during the suspension period.  Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform.  We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration.  We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory.  You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief.  We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice.  Consent or approval may be withheld while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5  **Your Remedies.**  If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation.  To the extent permitted by applicable law, this action shall be your exclusive remedy.  We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

12.    **Liquidated Damages.**

12.1    **Generally.**  If we terminate this Agreement under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as a Liquidated Damages, an amount equal to the sum of accrued Royalties and System Assessment Fees during the immediately preceding 24 full calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less).  If the Facility has been open for fewer than 24 months, then the amount shall be the average monthly Royalties and System Assessment Fees since the Opening Date multiplied by 24.  You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7.3 accruing from 30 days after the date of termination until the amount is paid.  Before the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended.  If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination, Liquidated Damages equal to one-half the amount payable for termination under Section 11.2.  Liquidated Damages are paid in place of our claims for lost future Recurring Fees

16

under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2    **Condemnation Payments.** If a Condemnation occurs, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2 or until the Condemnation occurs, whichever is longer. If the Condemnation is completed before the one year notice period expires, you will pay us Liquidated Damages equal to the average daily Royalties and System Assessment Fees for the 12 month period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). If the Condemnation is completed after the one year notice period expires you will pay no Liquidated Damages, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

13.    **Your Duties At and After Termination.** When a Termination occurs for any reason whatsoever:

13.1    **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2    **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Sales accruing while the Facility is identified as a "Super 8", including the System Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

17

13.3   **Advance Reservations.**  The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4   **Survival of Certain Provisions.**  Sections 3.6 (as to audits, for 2 years after termination), 3.11, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of this Agreement.

**14.**   <u>**Your Representations and Warranties.**</u>  The parties disclaim making or relying upon any representation, promise, covenant, or warranty, express or implied, oral or written, except as expressly stated in this Agreement. You expressly represent and warrant to us as follows:

14.1   **Quiet Enjoyment and Financing.**  You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2   **This Transaction.**  You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3   **No Misrepresentations or Implied Covenants.**  All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not

18

omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

### 15.   Proprietary Rights.

15.1   **Marks and System.**   You will not acquire any interest in or right to use the System or Marks except under this Agreement.   You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2   **Inurements.**   All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit.   No good will shall attach to any secondary designator that you use.

15.3   **Other Locations and Systems.**   We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as franchisor or franchisee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory.   You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks.   We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4   **Confidential Information.**   You will take all appropriate actions to preserve the confidentiality of all Confidential Information.   Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.   You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software).   You will use Confidential Information only for the Facility and to perform under this Agreement.   Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended.   Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in

19

confidence, even if edited or revised, plus three (3) years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5   **Litigation**. You will promptly notify us of: (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6   **The Internet**. You may use the Internet to market the Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark except as otherwise expressly permitted by the System Standards Manual or with our written consent. You will assign to us any such identification at our request without compensation or consideration. You may not purchase any key words for paid search or other electronic marketing that utilizes any Mark without our written consent. You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties. You agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to intermediaries and retailers on your behalf or for Chain Facilities to participate in their programs. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

16.   **Relationship of Parties**.

16.1   **Independence**. You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2   **Joint Status**. If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all

20

such persons or entities.

### 17. Legal Matters.

17.1   **Partial Invalidity.**  If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect.  If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2   **Waivers, Modifications and Approvals.**   If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice.  Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel.  All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3   **Notices.**   Notices will be effective if in writing and delivered: (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below.  The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us.  Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Super 8 Worldwide, Inc.:
Our address: 22 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Contracts Administration; Fax No. (973) 753-8311

Your name: SAINATH LLC,
Your address: 1813 Crestwood Boulevard, Jefferson, AL 35210,
Attention: Bhavin Patel; Your fax No.: _____.

17.4   **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity.  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5   **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties.  There are no third party beneficiaries.  No agreement between us and anyone else is for your benefit.  The section headings in this Agreement are for convenience of reference only.

### 17.6   Choice of Law; Venue; Dispute Resolution.

21

17.6.1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles.  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives.  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation.  Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc.  We will provide you with the contact address for that organization.  The mediation will be conducted by a mutually acceptable and neutral third party.  If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

**17.6.4  WAIVER OF JURY TRIAL.  THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17.6.5  Any judicial proceeding directly or indirectly arising from or relating to this Agreement shall be considered unique as to its facts and may not be brought as a class action.  You and each of the owners of your Equity Interests waive any right to proceed against us by way of class action.

**17.7  Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17.7.1  You received our Franchise Disclosure Document for prospective franchisees ("FDD") at least 14 days before signing this Agreement or paying any fee to us.**

**17.7.2  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement or in the FDD.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement or in the FDD.**

**17.7.3  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the Franchise.**

**17.7.4  You acknowledge that no salesperson has made any promise or provided any**

22

information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the FDD or in a writing that is attached to this Agreement.

**17.7.5** You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

**17.8** **Force Majeure**. Neither you nor we shall be liable for loss or damage or deemed to be in breach of this Agreement if the failure to perform obligations results from: (a) windstorms, rains, floods, earthquakes, typhoons, mudslides or other similar natural causes; (b) fires, strikes, embargoes, war, acts of terrorism or riot; (c) legal restrictions that prohibit or prevent performance; or (d) any other similar event or cause beyond the control of the party affected. Any delay resulting from any of such causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, so long as a remedy is continuously and diligently sought by the affected party, except that no such cause shall excuse payment of amounts owed at the time of such occurrence or payment of Recurring Fees and other amounts due to us subsequent to such occurrence other than a governmental or judicial order prohibiting such payments.

**18.** **Special Stipulations.** The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions. You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

**18.1** **Your Additional Termination Right**. You may terminate this Agreement without cause or penalty effective only on the fifth (5th) and tenth (10th) year anniversaries from the effective date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 200 points (or its then equivalent) on a quality assurance inspection and then fails to achieve a score less than 200 points (or its then equivalent) in a reinspection to be performed no sooner than 90 days after the initial inspection. You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

**18.2** **Our Additional Termination Right.** We may terminate this Agreement without cause or penalty effective only on the fifth (5th) and tenth (10th) year anniversaries from the effective date provided we give you at least six (6) months prior written notice of termination. You will perform the post termination obligations specified in this Agreement within 10 days after the effective date

*AP*

23

SUP8 Q1/09
#235280

of termination.  You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

24

IN WITNESS WHEREOF, the parties have executed this Agreement on this 30th day of September , 200 9 and agree to be bound by the terms and conditions of this Agreement as of the Effective Date.

**WE:**
SUPER 8 WORLDWIDE, INC.

By: _____
(Vice) President

**YOU**, as franchisee:
SAINATH LLC

By: _____
Manager

24

## APPENDIX A

### DEFINITIONS

<u>Advertising and Reservation Fund or "the Fund"</u> means The Super 8 Advertising and Reservation Fund into which System Assessment Fees are paid. The Fund is under our exclusive control, and shall be used by us for funding and administering, in our sole discretion, the reservation system, the training school, national and international directories, print and broadcast media advertising, technical and professional advice, consultation and services in connection with advertising, employment of personnel and office expenses for the administration of the Fund, advertising agency commissions, and other advertising or promotional programs we establish to promote the Chain.

<u>Agreement</u> means this Franchise Agreement.

<u>Application Fee</u> means the fee you pay when you submit your Application under Section 6.

<u>Approved Plans</u> means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Schedule D.

<u>Casualty</u> means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

<u>Chain</u> means the network of Chain Facilities.

<u>Chain Facility</u> means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

<u>Condemnation</u> means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

<u>Conference Fee</u> means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

<u>Confidential Information</u> means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

<u>Design Standards</u> mean standards specified in the System Standards Manual from time to time

25

for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means any general purpose directory we issue, whether printed, web-based, or issued in another medium, which may list the names and addresses of Chain Facilities in the United States, and at our discretion, other System facilities located outside the United States, Canada and Mexico.

Effective Date means the date we insert in the Preamble of this Agreement after we sign it.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the Effective Date.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service,

26

retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Franchise means the non-exclusive franchise to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

Franchise Year means:

    (i) *If the Opening Date occurs on the first day of a month*: the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

    (ii) *If the Opening Date does not occur on the first day of a month*: the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Gross Room Sales means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Schedule D.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6 if the Agreement is for a new construction or conversion franchise.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 6220 McClellan Blvd., Anniston, AL 36206, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee

27

dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Super 8 Motel" and other marks (U.S. Reg. Nos.: 992,721; 1,691,852; 1,686,653; 1,706,143; 1,602,723; 1,343,591, and 1,768,824) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.14.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

Opening Date has the meaning specified in Schedule D.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Protected Territory means an area within a circle created by a four (4) mile radius whose centerpoint is the front door of the Facility.

Prototype Plans has the meaning specified in Schedule D for New Construction Facilities.

Punch List means any list of upgrades and improvements attached as part of Schedule D, which you are required to complete under Section 3.1 and Schedule D.

28

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee pays to us when a Transfer occurs or the fee you pay to us if you are renewing an existing franchise.

Reinspection Fee means the fee you must pay to us under Section 3.7 if you do not complete your Punch List on time, fail any inspection or do not cooperate with our inspector or inspection System Standards.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Assessment Fee means the aggregate of all fees charged under Section 7.1.2 to pay for the cost of the System's marketing, advertising, Reservation System, training and other services.

System Standards means the standards for participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Rules of Operations Manual, the Trademark Identification Standards Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications

29

systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of this Agreement.

Transfer  means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility.  A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Super 8 Worldwide, Inc., a South Dakota corporation, its successors and assigns.

30

## SCHEDULE A

(Legal Description of Facility)

31

SUP8 Q1/09
#235280

## SCHEDULE B

PART I:      YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest | Office Held (Title) |
|------|---------------------|------------------------|---------------------|
| Amit Patel | 60.00% | Manager | |
| Ajit Patel | 20.00% | Member | |
| Bhavin Patel | 20.00% | Member | |

PART II:      THE FACILITY:

Primary designation of Facility: **Super 8 Motel**

Number of approved guest rooms: **44**.

Parking facilities (number of spaces, description): **44**.

Other amenities and facilities: **See Punchlist.**

Initial

SUP8 Q1/09
#235280

**SUPER 8 WORLDWIDE, INC.**
**SCHEDULE C**
**March 2009**

**I.**     **System Assessment Fee**

The System Assessment Fee is equal to three percent (3%) of Gross Room Sales, and is paid into the Advertising and Reservation Fund. The System Assessment Fee is a recurring, non-refundable payment. All or any part of Fund proceeds received during an accounting period need not be disbursed within that accounting period. Notwithstanding the above, we may increase the System Assessment Fee you pay upon 60 days advance written notice, effective at any time on or after the tenth (10th) anniversary of the Effective Date of this Agreement, as part of a Chain-wide increase in System Assessment Fees we implement in our sole discretion to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs. We may increase System Assessment Fees on a Chain-wide basis before the tenth anniversary of the Effective Date but such Fees will not begin to accrue at the increased rate until the tenth anniversary of the Effective Date.

**II.**    **Additional Fees**

**A.**     **Loyalty Program Charge**

We charge a Loyalty Program Charge for your participation in the Wyndham Rewards or successor guest loyalty program. The Loyalty Program Charge is up to 5% of the Gross Room Revenues accruing from each "qualifying stay" at the Facility as defined in the Front Desk Guide. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their Wyndham Rewards membership card upon check–in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

**B.**     **Guest Services Assessment**

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not resolve any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $100.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied room nights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish, we will charge you a "Processing Fee" of $60.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

SUP8 Q1/09
#235280

C.     **Best Available Rate Program**

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. If a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the applicable night(s) to the guest at 10% less than the lower rate offered on the Internet. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $60 to reimburse us for our administrative charges of handling the complaint.

D.     **Service Interruption Fee**

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service. If we must reactivate your service three or more times in any 12 month period, the Service Interruption Fee will be increased to $500.

E.     **Website Maintenance Fee**

We also charge you an annual website maintenance fee of $36.00 to maintain the Facility's web pages on the Chain's website. We may charge additional fees for creating or modifying the Facility's web pages or performing other services related to Internet marketing.

F.     **GDS and Internet Booking Fees**

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee, as applicable, for reservations processed through the global distribution systems ("GDS") or the Internet for your Facility. GDS Fees are assessed for reservations processed through any GDS or through any Internet website powered by a GDS. Internet Booking Fees are assessed for any other Internet-originated reservations. We do not currently charge any fees for reservations booked through our Chain website or through our direct connection to on-line travel agents. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee. GDS and Internet-originated reservations may also incur travel agent and similar commissions. We will establish the amount of the GDS and Internet Booking Fees from time to time based on a weighted average of the fees these distribution channels charge us plus a reasonable processing charge.

G.     **Travel Agent Commissions and Other Distribution Charges**

Travel agent and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agent or other qualifying originator, plus our service charge of .5% of commissionable revenue. Agencies which are part of a travel consortium or a

34

travel management company may charge additional commissions and/or participation fees to be included in their programs. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the travel agent commission.

We or an affiliate may charge you a commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and System Assessment Fees in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

We may change, modify or delete Additional Fees for existing services and programs and add new Additional Fees for new services and programs at any time upon not less than 30 days written notice.

SUP8 Q1/09
#235280

## SCHEDULE D
## ADDENDUM FOR TRANSFER FACILITIES

This Addendum applies if you are the transferee of an existing Super 8 Facility.

**1.     TRANSFER AND ASSUMPTION.**

This Addendum is for the transfer of an existing Chain Facility at the Location first granted to BHARAT VAIDYA AND DASKHA VAIDYA, ("Prior Franchisee") in a Franchise Agreement with us dated January 11, 1994 (the "Prior Agreement"). You assume and obligate yourself to perform any and all of the obligations (financial and otherwise) of the Prior Franchisee under the Prior Agreement that is not paid or performed as of the Effective Date, including without limitation, the obligation to pay any unpaid Royalties, System Assessment Fees or other amounts due us and to correct any uncured defaults other than as expressly superseded by this Agreement. You acknowledge that we may require you or your staff to complete training on the use of a property management or similar computer system and software for accessing the Reservation System and pay our retraining fee.

**2.     YOUR IMPROVEMENT OBLIGATION.**

2.1     **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards for entering conversion facilities. You must begin improvement of the Facility no later than thirty (30) days after the Effective Date. You must thereafter continue renovation and improvement of the Facility as the Punch List requires and pass any related quality assurance inspection we may conduct. We may, in our discretion, require you to place funds in escrow, at your expense, in order to complete all necessary renovations. All improvements will comply with System Standards, any Approved Plans, Schedule D and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation. If you do not commence or complete the improvement of the Facility by the dates specified in this Section 2.1, the Facility does not meet the post-transfer quality assurance inspection standard, or complete any post-transfer improvements specified in the Punch List after the Effective Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. You must also pay us the Reinspection Fee described in Section 3.7 if you fail to complete any Improvement Obligation by the deadline established in the Punch List and our representatives must return to the Facility to inspect it. We may grant you an extension of time to complete the items on your Punch List in our sole discretion. The grant of an extension to perform your Improvement Obligation will not waive any other default existing at the time the extension is granted.

2.2     **Improvement Plans.** You will create plans and specifications for the work described in Section 2.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers,

36

contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. We may offer to provide you or your architect with interior design or other prototypes. If you decline to utilize such prototype(s) in developing the Facility, we may charge you a fee for reviewing your custom plans and designs. We may offer other optional architectural and design services for a separate fee. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

2.3     **Opening.** You may continue to identify and operate the Facility as part of the System while you perform the Improvement Obligation, if any.

3.     **DEFINITIONS.**

Effective Date means the date that you first take possession of the Facility, even if you sign this Agreement after the date you first take possession of the Facility.

Opening Date means the date as of which we authorize you to open the Facility for business identified by the Marks and using the System, even if you sign this Agreement after that date. Unless we require that you close the Facility to perform any pre-opening Improvement Obligation, the Opening Date is the Effective Date.

SUP8 Q1/09
#235280

## SCHEDULE D
## ADDENDUM FOR TRANSFER FACILITIES

[Punch List Attached.]

38

SUP8 Q1/09
#235280

File Name: 08129 CO S8

Insert Tier



Super 8 Worldwide, Inc.
Punchlist for Change of Ownership
"Schedule B part III"
July 30, 2009

Page 1 of 3

| OWNER APPLICANT | |
| --- | --- |
| Property Name: | Super 8 #8129 |
| Property Address: | 6220 McClellan Boulevard |
| City: | Anniston |
| St: | AL |
| Zip: | 36206 |
| Conversion Consultant: | Phil Osborne |
| Owner/Applicant: | Bhavin Patel |
| Owner Phone: | (205) 215-8764 |
| Franchise Retention: | Robert Chung |
| Phone: | (973) 753-7476 |
| Nearest City & State | Alabama - Birmingham |

**PROPERTY CONDITION SUMMARY**

In House Punchlist.

**ROOM DIMENSIONS-EXISTING**

| | # of Rms | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | # of Rms | N/A | (width) | X | N/A | (length) | = | sq. ft |
| | # of Rms | | (width) | X | | (length) | = | sq. ft |
| | # of Rms | | (width) | X | | (length) | = | sq. ft |
| | # of Rms | | (width) | X | | (length) | = | sq. ft |
| | # of Rms | | (width) | X | | (length) | = | sq. ft |
| | # of Rms | | (width) | X | | (length) | = | sq. ft |
| | # of Rms | | (width) | X | | (length) | = | sq. ft |
| | # of Rms | | (width) | X | | (length) | = | sq. ft |

Room Dimension Standard | 288 SF
Total Number of Buildings Punched | N/A | Total Number of floors | N/A
Rooms Inspected | N/A | Total Number of Rooms | 44

| Guestrooms | 44 |
| --- | --- |
| Total rooms: | 44 |

STANDARD | 500 SF

**PUBLIC AREAS DIMENSIONS-EXISTING**

| | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Lobby | N/A | (width) | X | N/A | (length) | = | sq. ft | | |
| | | (width) | X | | (length) | = | sq. ft | | |
| | | (width) | X | | (length) | = | sq. ft | | |
| | | (width) | X | | (length) | = | sq. ft | | |
| | | (width) | X | | (length) | = | sq. ft | | |
| | | (width) | X | | (length) | = | sq. ft | | |
| | | (width) | X | | (length) | = | sq. ft | | |
| | | (width) | X | | (length) | = | sq. ft | | |
| | | (width) | X | | (length) | = | sq. ft | | |
| | | (width) | X | | (length) | = | sq. ft | | |

**BRAND VARIANCES**

ONLY THE FRANCHISOR MAY REVISE THIS PUNCHLIST. PUNCHLIST VOID 180 DAYS AFTER INSPECTION DATE UNLESS FRANCHISE OR LICENSE AGREEMENT BECOMES EFFECTIVE

The Punchlist identifies specific items which we inspected at the Facility which were not in compliance with brand standards and need to be corrected. In addition, you are responsible for ensuring that the Facility is constructed, improved, maintained and operated in compliance with all applicable federal, state and local laws, codes, ordinances and regulations, including but not limited to, the Americans with Disability Act and its Accessibility Guidelines. This Punchlist was based on a random sample inspection of the Facility on the date specified. You may need to take additional actions to meet brand standards or comply with law or, at our discretion, if the condition of the Facility changes materially since the inspection date or if the brand standards change.

Failure to comply with specified deadlines for completing items may result in default under your franchise agreement and reservation service suspension.

The Franchise Review Committee may in its discretion revise this Punchlist as a condition of approving your application. You should not consider this Punchlist to be final until we sign the License or Franchise Agreement.

Signed: _____   Date: 7-14-09

Print Name: AMIT PATEL

08129 CO S8

Page 2

| Completion Date | Scope of Work | For Office Use Only |
|---|---|---|
| | **Exterior** | |
| 120 days from new License Agreement | Paint building exteriors (doors, fascia, gutters, downspouts and trim work) per an approved Super 8 color scheme. Contact Design and Construction Services at (877) WHG-1515 for approved color schemes. | |
| 60 days from new License Agreement | Refinish privacy fencing at the outdoor swimming pool to a "like new" condition. | |
| 30 days from new License Agreement | Eliminate weeds from existing landscaped beds. Provide additional ground cover (mulch, rock, bark) as needed in existing landscaped areas. | |
| | **Public Areas** | |
| 120 days from new License Agreement | Replace existing property management system with the SoftHotel system. | |
| 90 days from new License Agreement | All owners/general managers are required to attend all Brand orientation/training. | |
| 90 days from new License Agreement | Property manager is required to be Wyndham Rewards certified and property must fully comply with all Wyndham Rewards requirements. | |
| Immediate compliance | Provide a portable phone for the manager's use. | |
| Immediate compliance | Provide a SuperStart® breakfast per System Standards. | |
| Immediate compliance | Provide a minimum 24" television in the breakfast area enclosed in professionally crafted millwork that will complement the décor unless a wall-mounted flat panel television is provided. | |
| Immediate compliance | Provide breakfast area seating for a minimum of 11 persons. Chairs with padded backs and seats are required, unless café style seating (padded seats only) is utilized. Vinyl finishes are recommended, however commercial grade fabric is strongly recommended. | |
| 60 days from new License Agreement | Replace public area signage package, to include room number plaques, with the S8 approved signage package that incorporates the new graphic elements. Contact American Image at (800) 385-9223, Graphic Systems, Inc. at (316) 267-4171 or Western Printing at (800) 645-3856 for assistance. | |
| | **Guestrooms** | |
| Immediate compliance | Provide a luggage rack or bench,1200-watt hairdryers (wall mounted in vanity area is recommended), AM/FM clock radios, wired or wireless Internet (in the writing surface area) and all required supplies. | |
| Immediate compliance | A minimum of 60% of guestrooms must be designated as non-smoking. Cable or Satellite TV with free premium channels is required. Channel selections include the major networks (ABC, NBC, CBS or FOX, etc. and premium selection free movies (HBO®, Showtime®, etc.) news (CNN or FOX, etc.) and sports channels (ESPN or FOX, etc.). | |
| Immediate compliance | Replace non-compliant showerheads as in room #222 with the Seasons 8 setting massage showerheads or equivalent. Provide The ARC curved shower rods and textured box print Hookless® shower curtains in all guestrooms. | |
| Immediate compliance | All guestrooms must be equipped with a UL rated coffeemaker with auto shut-off and including all required coffee supplies as per System Standards. | |
| 1 year from new License Agreement | The Brand has required the property to complete the "Refresh" Innov8te option to include but not be limited to: bedspreads, drapes and flooring (wood like vinyl floor with area rug or carpet). Contact Charles Ticketbaud of American Hotel Furnishings at (847) 743-1443 for assistance. For further administrative assistance contact Dorothy Bennett at (973) 753-8312. Upon installation of new headboards, remove existing artwork and refinish any affected areas to like-new condition. | |
| 120 days from new License Agreement | All furniture, finishes, fixtures, etc. must match or coordinate within the guestroom. | |
| 120 days from new License Agreement | Replace rusted bath door hinges as in room #206. | |
| 30 days from new License Agreement | Replace secondary U-bar locks where damaged or broken as in room #222. | |

Initial 

08129 CO S8

| Completion Date | Scope of Work | For Office Use Only |
|---|---|---|
| | **Guestrooms Continued** | |
| 90 days from new License Agreement | Repair connecting doors where inoperable as in room #112. Paint/clean connecting doors where stained or discolored as in room #222. | |
| 120 days from new License Agreement | Replace/repair casegoods where pulls are loose or damaged as in room #112. Replace casegoods where finishes are mismatched (i.e. headboards, nightstands, activity tables, credenzas, etc.). All casegood finishes must match within each room. New casegoods are to include a minimum of one credenza/armoire/dresser, a wall mounted, framed wall or full-length mirror, one headboard per bed, one freestanding nightstand in rooms with two beds and two freestanding nightstands in rooms with one bed. A minimum of one writing surface is required to consist of either a writing desk or an activity table. Two chairs (minimum one with arms) per room are required. Chairs must be fabric covered. If a desk is provided, a fabric upholstered desk chair with a padded seat and back is required. | |
| 120 days from new License Agreement | Replace lampshades where stained or damaged as in room #105. All shades must match within each room. | |
| 120 days from new License Agreement | Replace vanity mirrors where desilvered or damaged as in room #206. At a minimum 30" x 30" mirrors are required. | |

Initials 

# EXHIBIT B

## GUARANTY

To induce Super 8 Worldwide, Inc., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**GUARANTORS:**

Name:      Amit Patel
Address:   1813 Crestwood Blvd., Irondale, AL 35210

Name:      Ajit Patel
Address:   5212 Inlet Drive, Bensalem, PA 19020

Name:      Bhavin Patel
Address:   1813 Crestwood Blvd., Irondale, AL 35210

39

# EXHIBIT C



**WYNDHAM**

HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445
www.wyndhamworldwide.com

June 28, 2012

<u>**VIA 2 DAY DELIVERY METHOD**</u>

Mr. Bhavin Patel
Sainath LLC
1813 Crestwood Boulevard
Jefferson, AL 35210

Re:    **NOTICE OF TERMINATION** of the License for Super 8® System Unit #8129-87934-02 located in Anniston, AL (the "Facility")

Dear Mr. Patel:

Super 8 Worldwide, Inc., successor in interest to Super 8 Motels, Inc. ("we" or "us") has received the Foreclosure Deed dated April 18, 2012 indicating that on April 18, 2012 (the "Termination Date"), Sainath LLC ("you" or "your") relinquished control of the Facility to Mountain 1st Bank & Trust. Accordingly, the Franchise Agreement, dated September 30, 2009 as amended (the "Agreement"), has terminated.

The Agreement requires you to perform certain post termination obligations.   In addition to other obligations specified in the Agreement, by no later than ten days after the date of this letter, you must (a) remove all signage and other items bearing the Super 8 Marks; (b) perform all post-termination obligations specified in the Systems Standards Manual; (c) change all signs, billboards, and listings in telephone directories, travel guides, hotel indexes and similar materials in which the Facility is identified as a Super 8 facility; and (d) remove the Super 8 Marks from any advertising or promotional activities on, around or directed towards the Facility, including any web sites, web pages or search engines.  You must cooperate fully with us regarding any post-termination inspections by us to verify that the Facility has been properly de-identified.  You must immediately return to us all training documents, operating manuals and other proprietary material.

Because you terminated the Agreement prematurely, you must pay us Liquidated Damages of $84,000.00, as specified in Section 12.1 of the Agreement. You must also pay any outstanding Recurring Fees and any other fees and charges through the date you complete the de-identification of the Facility. We estimate that, as of the date of this letter, you owe us $91,238.55 in such fees and charges.  Please pay us this amount within fourteen days.  Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to all of your Guarantors.

**WYNDHAM**

HOTEL GROUP


       
       

Mr. Bhavin Patel
June 28, 2012
Page Two

Please know that, because the Agreement has terminated, you also have lost your right to continue to use the seamless interface version of your property management system.  You must now make your own arrangements with the software vendor for a new license to use the property management system.  If the Facility has the WynGuest system installed, please be advised that due to the termination you will have limited functionality from the system. Should you wish to continue using an independent version of the software and are interested in a minimum continuation agreement of 24 months, please contact Sabre at 877-520-3646, an authorized reseller of the WynGuest product. If your property is planning to migrate to another property management system in less than 24 months, please contact your provider to expedite the installation. If you would like to inquire about the data maintained in the system, please contact Scott Robertson at 506-631-2104 to obtain reporting of that data.

Should you have any questions regarding this matter, please contact Charlene Martin, Senior Manager of Settlements, at (973) 753-7602.

Sincerely,

Valerie Capers Workman
Vice President
Compliance & Government Relations

cc:     Mountain 1st Bank & Trust (Lender) ~ 101 Jack Street, Hendersonville, NC 28792
        Amit Patel (Guarantor)
        Ajit Patel (Guarantor)
        Bhavin Patel (Guarantor)
        John Valletta
        Larry Geer
        Charlene Martin

Report Date : 27-JUN-12

ITEMIZED STATEMENT
------------------

```
As of Date (DD-MMM-YYYY) : 18-APR-2012
Customer No              : 08129-87934-02-SUP
Category Set             :
Category Group           :
Group No                 :
Bankruptcy               : No Bankruptcy Sites
Disputed                 : No
Finance Charges Included : Yes
```

Page 1 of 11

ITEMIZED STATEMENT

Report Date : 27-JUN-12

Customer No : 08129-87934-02-SUP
Address : 6220 McClellan Boulevard,Anniston,AL,36206,US
As of Date: 18-APR-2012

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| MAR-2010 | 30411597 | 12-MAR-10 | '10 GLOBAL CONF | | 999.00 | 0.00 | 321.05 | 1346.56 |
| | | | Sub Total | | 999.00 | 0.00 | 321.05 | 1346.56 |
| | | | | | ======== | ======== | ======== | ======== |
| | | | | | 999.00 | 0.00 | 321.05 | 1346.56 |
| | | | | | ======== | ======== | ======== | ======== |
| APR-2010 | TM0128199 | 18-APR-10 | MEMBER BENEFIT | | 5.20 | 0.00 | 1.75 | 7.11 |
| | 1128199 | 18-APR-10 | GDS & INTERNET | | 15.05 | 0.00 | 5.02 | 20.53 |
| | TA0128199 | 18-APR-10 | T/A COMMISSIONS | | 24.17 | 0.00 | 8.01 | 32.91 |
| | 26151468 | 22-APR-10 | WYNREWARDS 5% | | 121.84 | 0.00 | 40.80 | 166.36 |
| | 41370332 | 30-APR-10 | Actual-1000A-RO | | 2044.89 | 0.00 | 684.05 | 2791.31 |
| | 41353915 | 30-APR-10 | 5096A-SOFTHOTEL | | 181.91 | 16.37 | 66.27 | 270.59 |
| | 41353689 | 30-APR-10 | 5096A-DIRECWAY | | 160.00 | 14.40 | 58.32 | 238.04 |
| | 41370067 | 30-APR-10 | Actual-1215A-AD | | 1115.40 | 0.00 | 373.11 | 1522.53 |
| | | | Sub Total | | 3668.46 | 30.77 | 1237.33 | 5049.38 |
| | | | | | ======== | ======== | ======== | ======== |
| MAY-2010 | 26154350 | 22-MAY-10 | WYNREWARDS 5% | | 245.60 | 0.00 | 78.48 | 331.57 |
| | TR0135468 | 23-MAY-10 | TMC / CONSORTIA | | 71.76 | 0.00 | 22.92 | 96.87 |
| | TA0135468 | 23-MAY-10 | T/A COMMISSIONS | | 192.44 | 0.00 | 61.47 | 259.78 |
| | 1135468 | 23-MAY-10 | GDS & INTERNET | | 93.90 | 0.00 | 30.06 | 126.83 |
| | TM0135468 | 23-MAY-10 | MEMBER BENEFIT | | 4.40 | 0.00 | 1.45 | 5.99 |
| | TC0135468 | 23-MAY-10 | T/A COMM SERVIC | | 14.78 | 0.00 | 4.72 | 19.95 |
| | 41404624 | 31-MAY-10 | Actual-1215A-AD | | 658.64 | 0.00 | 210.45 | 889.18 |
| | 41388130 | 31-MAY-10 | 5096A-SOFTHOTEL | | 181.91 | 16.37 | 63.29 | 267.61 |
| | 41403717 | 31-MAY-10 | Actual-1000A-RO | | 1207.50 | 0.00 | 385.83 | 1630.16 |
| | 41386402 | 31-MAY-10 | 5096A-DIRECWAY | | 160.00 | 14.40 | 55.71 | 235.43 |
| | | | Sub Total | | 2830.93 | 30.77 | 914.38 | 3863.37 |
| | | | | | ======== | ======== | ======== | ======== |
| JUN-2010 | 30448430 | 04-JUN-10 | OTA Credit | | (35.86) | 0.00 | 0.00 | (35.86) |
| | 1141767 | 20-JUN-10 | GDS & INTERNET | | 14.55 | 0.00 | 4.48 | 19.48 |
| | TM01141767 | 20-JUN-10 | MEMBER BENEFIT | | 8.79 | 0.00 | 2.70 | 11.76 |
| | TA01141767 | 20-JUN-10 | T/A COMMISSIONS | | 8.86 | 0.00 | 2.70 | 11.83 |
| | 26157547 | 22-JUN-10 | WYNREWARDS 5% | | 199.69 | 0.00 | 60.80 | 266.59 |

Page 2 of 11

Report Date : 27-JUN-12

ITEMIZED STATEMENT
--------------------------

Customer No :  08129-87934-02-SUP
Address    :  6220 McClellan Boulevard,Anniston,AL,36206,US
As of Date:  18-APR-2012

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
|  | 41420938 | 30-JUN-10 | 5066A-DIRECWAY | | 160.00 | 14.40 | 53.01 | 232.73 |
|  | 41437490 | 30-JUN-10 | Actual-1215A-AD | | 776.48 | 0.00 | 236.12 | 1036.29 |
|  | 41436642 | 30-JUN-10 | Actual-1000A-RO | | 1423.55 | 0.00 | 432.79 | 1899.76 |
|  | 41421272 | 30-JUN-10 | 5096A-SOFTHOTEL | | 181.91 | 16.37 | 60.22 | 264.54 |
|  |  |  | Sub Total | | 2737.97 | 30.77 | 852.82 | 3707.12 |
| JUL-2010 | 30464108 | 14-JUL-10 | SUPER8 TRAINING | | 185.00 | 16.65 | 61.31 | 269.11 |
|  | 1148267 | 18-JUL-10 | GDS & INTERNET | | 29.60 | 0.00 | 8.53 | 39.03 |
|  | TM0148267 | 18-JUL-10 | MEMBER BENEFIT | | 8.79 | 0.00 | 2.57 | 13.63 |
|  | 41469938 | 22-JUL-10 | WYNREWARDS 5% | | 166.80 | 0.00 | 48.17 | 220.06 |
|  | 41469938 | 31-JUL-10 | Actual-1000A-RO | | 1333.25 | 0.00 | 557.80 | 2550.02 |
|  | 41471397 | 31-JUL-10 | Actual-1215A-AD | | 1054.50 | 0.00 | 304.18 | 1390.84 |
|  | 30473990 | 31-JUL-10 | HughesNet VSAT | | 160.00 | 14.40 | 50.30 | 230.02 |
|  | 41452850 | 31-JUL-10 | 5096A-SOFTHOTEL | | 181.91 | 16.37 | 57.16 | 261.48 |
|  |  |  | Sub Total | | 3719.85 | 47.42 | 1090.02 | 4972.19 |
| AUG-2010 | 26163362 | 22-AUG-10 | WYNREWARDS 5% | | 562.31 | 0.00 | 153.80 | 733.26 |
|  | 26165607 | 22-AUG-10 | WYNREWARDS CRDT | | (31.69) | 0.00 | 0.00 | (31.69) |
|  | TRO155058 | 22-AUG-10 | TMC / CONSORTIA | | 148.03 | 0.00 | 40.44 | 192.98 |
|  | TM0155058 | 22-AUG-10 | MEMBER BENEFIT | | 4.80 | 0.00 | 1.26 | 6.20 |
|  | TC0155058 | 22-AUG-10 | T/A COMM SERVIC | | 33.35 | 0.00 | 9.15 | 43.52 |
|  | 1155058 | 22-AUG-10 | GDS & INTERNET | | 149.20 | 0.00 | 40.79 | 194.54 |
|  | TA0155058 | 22-AUG-10 | T/A COMMISSIONS | | 439.38 | 0.00 | 120.16 | 572.94 |
|  | 41503754 | 31-AUG-10 | Actual-1215A-AD | | 777.32 | 0.00 | 212.61 | 1013.64 |
|  | 41502915 | 31-AUG-10 | Actual-1000A-RO | | 1425.08 | 0.00 | 389.79 | 1858.34 |
|  | 30481687 | 31-AUG-10 | HughesNet VSAT | | 160.00 | 14.40 | 47.69 | 227.41 |
|  | 41496443 | 31-AUG-10 | 5096A-SOFTHOTEL | | 181.91 | 16.37 | 54.18 | 258.50 |
|  |  |  | Sub Total | | 3849.69 | 30.77 | 1069.87 | 5069.64 |
| SEP-2010 | 10494275 | 02-SEP-10 | GUEST SRVCS TRA. | | 160.00 | 0.00 | 43.76 | 208.64 |

Page 3 of 11

Report Date : 27-JUN-12

ITEMIZED STATEMENT

```
Customer No :   08129-87934-02-SUP
Address    :    6220 McClellan Boulevard,Anniston,AL,36206,US
As of Date:     18-APR-2012
```

|         |            |              |                  |         |         | Amount |                |         |
|---------|------------|--------------|------------------|---------|---------|--------|----------------|---------|
| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Tax | FinanceCharges | Total |

| Mon-Year | Invoice No | Invoice Date | Description | Billing | Tax | FinanceCharges | Total |
|---------|------------|--------------|-------------|---------|-----|----------------|-------|
|  | 10494277 | 02-SEP-10 | GUEST SATISFACT | 35.00 | 0.00 | 9.58 | 45.65 |
|  | TCO161418 | 19-SEP-10 | T/A COMM SERVIC | 20.63 | 0.00 | 5.33 | 26.59 |
|  | TRO161418 | 19-SEP-10 | TMC / CONSORTIA | 72.09 | 0.00 | 18.63 | 92.92 |
|  | TAO161418 | 19-SEP-10 | T/A COMMISSIONS | 275.38 | 0.00 | 71.06 | 354.84 |
|  | 1161418 | 19-SEP-10 | GDS & INTERNET | 39.80 | 0.00 | 10.32 | 51.34 |
|  | 26167508 | 22-SEP-10 | WYNREWARDS 5$ | 405.28 | 0.00 | 104.55 | 522.19 |
|  | 30493495 | 30-SEP-10 | HughesNet VSAT | 160.00 | 14.40 | 44.98 | 224.70 |
|  | 41518116 | 30-SEP-10 | 5096A-SOFTHOTEL | 181.91 | 16.37 | 51.12 | 255.44 |
|  | 41537575 | 30-SEP-10 | Actual-1215A-AD | 893.46 | 0. | 230.53 | 1151.24 |
|  | 41534774 | 30-SEP-10 | Actual-1000A-RO | 1638.01 | 0.00 | 422.61 | 2110.58 |
|  |  |  | Sub Total | 3881.56 | 30.77 | 1012.47 | 5044.13 |
| OCT-2010 | TAO168704 | 17-OCT-10 | T/A COMMISSIONS | 22.78 | 0.00 | 5.50 | 28.97 |
|  | TRO168704 | 17-OCT-10 | TMC / CONSORTIA | 4.20 | 0.00 | 1.05 | 5.38 |
|  | 1168704 | 17-OCT-10 | GDS & INTERNET | 21.40 | 0.00 | 5.18 | 27.23 |
|  | 26170642 | 22-OCT-10 | WYNREWARDS 5$ | 238.03 | 0.00 | 57.84 | 303.13 |
|  | 30502944 | 31-OCT-10 | HughesNet VSAT | 160.00 | 14.40 | 42.37 | 222.09 |
|  | 41569469 | 31-OCT-10 | Actual-1215A-AD | 1317.66 | 0.00 | 320.14 | 1677.98 |
|  | 41568857 | 31-OCT-10 | Actual-1000A-RO | 2415.72 | 0.00 | 587.01 | 3076.41 |
|  | 41552021 | 31-OCT-10 | 5096A-SOFTHOTEL | 181.91 | 16.37 | 48.14 | 252.46 |
|  |  |  | Sub Total | 4361.70 | 30.77 | 1067.23 | 5593.65 |
| NOV-2010 | TCO175375 | 21-NOV-10 | T/A COMM SERVIC | 15.77 | 0.00 | 3.57 | 19.82 |
|  | 1175375 | 21-NOV-10 | GDS & INTERNET | 84.60 | 0.00 | 19.24 | 106.42 |
|  | TRO175375 | 21-NOV-10 | TMC / CONSORTIA | 51.90 | 0.00 | 11.78 | 65.26 |
|  | TAO175375 | 22-NOV-10 | T/A COMMISSIONS | 209.45 | 0.00 | 47.67 | 263.51 |
|  | 26175396 | 22-NOV-10 | WYNREWARDS 5$ | 427.92 | 0.00 | 97.33 | 538.30 |
|  | 41504639 | 30-NOV-10 | 5715A-HughesNet | 160.00 | 14.40 | 39.67 | 219.39 |
|  | 41500265 | 30-NOV-10 | Actual-1000A-RO | 1587.45 | 0.00 | 361.17 | 1997.04 |
|  | 41581635 | 30-NOV-10 | 5096A-SOFTHOTEL | 181.91 | 16.37 | 45.07 | 249.39 |
|  | 41602388 | 30-NOV-10 | Actual-1215A-AD | 865.88 | 0.00 | 196.99 | 1089.28 |

Page 4 of 11

Report Date : 27-JUN-12

ITEMIZED STATEMENT
---------------------

Customer No :   08129-87934-02-SUP
Address :       6220 McClellan Boulevard,Anniston,AL,36206,US
As of Date:     18-APR-2012

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| DEC-2010 | TCO181947 | 20-DEC-10 | T/A COMM SERVIC | | 5.40 | | 1.11 | 6.67 |
| | TMO181947 | 20-DEC-10 | MEMBER BENEFIT | | 57.55 | 0.00 | 12.17 | 71.47 |
| | 1101947 | 20-DEC-10 | GDS & INTERNET | | 24.00 | 0.00 | 5.07 | 29.80 |
| | TAO181947 | 20-DEC-10 | T/A COMMISSIONS | | 14.39 | 0.00 | 3.04 | 17.87 |
| | 26177645 | 22-DEC-10 | WYNREWARDS 5% | | 173.48 | 0.00 | 36.78 | 215.55 |
| | 10516862 | 22-DEC-10 | GUEST SATISFACT | | 59.93 | 0.00 | 12.72 | 74.48 |
| | 10516860 | 22-DEC-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 33.92 | 198.80 |
| | 41616685 | 31-DEC-10 | 5715A-HughesNet | | -160.00 | 14.40 | 36.96 | 216.68 |
| | 41634744 | 31-DEC-10 | Actual-1215A-AD | | 752.84 | 0.00 | 159.60 | 935.40 |
| | 41633314 | 31-DEC-10 | Actual-1000A-RO | | 1380.21 | 0.00 | 292.56 | 1714.86 |
| | 41618287 | 31-DEC-10 | 5096A-SOFTHOTEL | | 181.91 | 16.37 | 42.00 | 246.32 |
| | | | Sub Total | | 3584.88 | 30.77 | 822.49 | 4548.41 |
| JAN-2011 | 1188680 | 16-JAN-11 | GDS & INTERNET | | 11.20 | | 2.36 | 13.90 |
| | TAO188680 | 16-JAN-11 | T/A COMMISSIONS | | 9.34 | 0.00 | 1.95 | 11.57 |
| | 26179847 | 22-JAN-11 | WYNREWARDS 5% | | 56.31 | 0.00 | 11.76 | 69.78 |
| | 41668090 | 31-JAN-11 | Actual-1215A-AD | | 717.73 | 0.00 | 147.12 | 886.74 |
| | 41666464 | 31-JAN-11 | Actual-1000A-RO | | 1315.84 | 0.00 | 269.79 | 1625.77 |
| | 41649260 | 31-JAN-11 | 5715A-HughesNet | | 160.00 | 14.40 | 35.74 | 215.46 |
| | 41650357 | 31-JAN-11 | 5096A-SOFTHOTEL | | 181.91 | 16.37 | 40.61 | 244.93 |
| | | | Sub Total | | 2969.71 | 30.77 | 635.93 | 3727.90 |
| FEB-2011 | 30539516 | 14-FEB-11 | 2011 REG'L TRAI | | 499.00 | 0.00 | 98.80 | 613.02 |
| | 1194578 | 20-FEB-11 | GDS & INTERNET | | 19.40 | 0.00 | 3.77 | 23.76 |
| | TMO194578 | 20-FEB-11 | MEMBER BENEFIT | | 4.80 | 0.00 | 0.90 | 5.84 |
| | TAO194578 | 20-FEB-11 | T/A COMMISSIONS | | 5.40 | 0.00 | 1.02 | 6.58 |
| | 26184093 | 22-FEB-11 | WYNREWARDS 5% | | 86.17 | 0.00 | 16.74 | 105.54 |
| | 41684043 | 28-FEB-11 | 5715A-HughesNet | | 160.00 | 14.40 | 33.31 | 213.03 |
| | | | Sub Total | | 2452.33 | 30.77 | 509.33 | 3068.15 |

Page 5 of 11

Report Date : 27-JUN-12

ITEMIZED STATEMENT
----------------

Customer No  :   08129-87934-02-SUP
Address      :   6220 McClellan Boulevard,Anniston,AL,36206,US
As of Date:      18-APR-2012

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
|          | 41700652  | 28-FEB-11    | Actual-1000A-RO     |         | 1668.18  | 0.00  | 318.64  | 2037.70 |
|          | 41699403  | 28-FEB-11    | Actual-1215A-AD     |         | 909.92   | 0.00  | 173.77  | 1111.44 |
|          | 41683239  | 28-FEB-11    | 5096A-SOFTHOTEL     |         | 191.01   | 17.19 | 39.78   | 254.33  |
|          |           |              | Sub Total           |         | 3543.88  | 31.59 | 686.73  | 4371.24 |
|          |           |              |                     |         | =========| ======| ========| ======= |
| MAR-2011 | 30551405  | 07-MAR-11    | OCT 2010 NT AUD     |         | 269.83   | 0.00  | 50.58   | 328.64  |
|          | 30551474  | 07-MAR-11    | OCT 2010 NT AUD     |         | 147.18   | 0.00  | 27.59   | 179.26  |
|          | TC0201297 | 13-MAR-11    | T/A COMM SERVIC     |         | 3.62     | 0.00  | 0.67    | 4.40    |
|          | 1201297   | 13-MAR-11    | GDS & INTERNET      |         | 24.00    | 0.00  | 4.38    | 29.11   |
|          | TA0201297 | 13-MAR-11    | T/A COMMISSIONS     |         | 20.40    | 0.00  | 3.78    | 24.81   |
|          | TM0201297 | 13-MAR-11    | MEMBER BENEFIT      |         | 28.00    | 0.00  | 5.10    | 33.95   |
|          | 26187582  | 22-MAR-11    | WYNREWARDS 5%       |         | 23.70    | 0.00  | 4.29    | 28.72   |
|          | 41729648  | 31-MAR-11    | Actual-1000A-RO     |         | 2175.88  | 0.00  | 381.90  | 2624.15 |
|          | 41716089  | 31-MAR-11    | 5715A-HughesNet     |         | 160.00   | 14.40 | 30.60   | 210.32  |
|          | 41716003  | 31-MAR-11    | 5096A-SOFTHOTEL     |         | 191.01   | 17.19 | 36.55   | 251.10  |
|          | 41731750  | 31-MAR-11    | Actual-1215A-AD     |         | 1186.84  | 0.00  | 208.31  | 1431.35 |
|          |           |              | Sub Total           |         | 4230.46  | 31.59 | 753.75  | 5145.81 |
|          |           |              |                     |         | =========| ======| ========| ======= |
| APR-2011 | 26191548  | 22-APR-11    | WYNREWARDS CRDT     |         | (27.06)  | 0.00  | 0.00    | (27.06) |
|          | 26190400  | 22-APR-11    | WYNRWD CREDIT       |         | (2.75)   | 0.00  | 0.00    | (2.75)  |
|          | 26189262  | 22-APR-11    | WYNREWARDS 5%       |         | 72.70    | 0.00  | 11.97   | 86.89   |
|          | 1208248   | 27-APR-11    | GDS & INTERNET      |         | 49.00    | 0.00  | 7.96    | 58.46   |
|          | TC0208248 | 27-APR-11    | GOVERMENT FEES      |         | 8.54     | 0.00  | 1.37    | 10.17   |
|          | TV0208248 | 27-APR-11    | T/A COMM SERVIC     |         | 4.30     | 0.00  | 0.70    | 5.13    |
|          | TM0208248 | 27-APR-11    | MEMBER BENEFIT      |         | 10.80    | 0.00  | 1.76    | 12.89   |
|          | TA0208248 | 27-APR-11    | T/A COMMISSIONS     |         | 46.60    | 0.00  | 7.54    | 55.56   |
|          | 41748768  | 30-APR-11    | 5096A-SOFTHOTEL     |         | 191.01   | 17.19 | 33.43   | 247.98  |
|          | 41748768  | 30-APR-11    | Actual-1000A-RO     |         | 2704.73  | 0.00  | 434.09  | 3221.31 |
|          | 41763929  | 30-APR-11    | Actual-1215A-AD     |         | 1475.31  | 0.00  | 236.80  | 1757.11 |
|          | 41748117  | 30-APR-11    | 5715A-HughesNet     |         | 160.00   | 14.40 | 27.99   | 207.71  |

```
                                              ITEMIZED STATEMENT                                    Report Date : 27-JUN-12
                                              -----------------


Customer No  :  08129-87934-02-SUP
Address   :     6220 McClellan Boulevard,Anniston,AL,36206,US
As of Date:     18-APR-2012


                                                                                    Amount
Mon-Year   Invoice No   Invoice Date   Description   Accrued   Billing      Tax     FinanceCharges      Total
--------   ----------   ------------   -----------   -------   -------      ---     --------------      -----


MAY-2011   30583332     11-MAY-11   Duplicate Commi            (10.20)     0.00        0.00           (10.20)
           30587890     11-MAY-11   Duplicate GSA/I            (22.40)     0.00        0.00           (22.40)
           26193381     22-MAY-11   WYNREWARDS 5%               122.45     0.00       18.33           144.52
           1213652      27-MAY-11   GDS & INTERNET               5.60      0.00        0.83             6.60
           41793105     31-MAY-11   Actual-1000A-RO           1364.32      0.00      197.83          1603.76
           41778879     31-MAY-11   5096A-SOFTHOTEL            191.01      17.19       30.20           244.75
           41778617     31-MAY-11   571SA-HughesNet           160.00      14.40       25.28           205.00
           41794851     31-MAY-11   Actual-1215A-AD           744.18       0.00      107.87           874.74
                                                            ==========  ========  ==============  ===========
                                          Sub Total         4693.18       31.59      763.61          5633.40
                                                            ==========  ========  ==============  ===========


JUN-2011   26196960     22-JUN-11   WYNREWARDS 5%              102.75      0.00       13.75           119.63
           1221500      27-JUN-11   GDS & INTERNET             10.20       0.00        1.35            11.86
           TC0221500    27-JUN-11   T/A COMM SERVIC             3.90       0.00        0.52             4.54
           TA0221500    27-JUN-11   T/A COMMISSIONS            52.00       0.00        6.85            60.44
           41811864     30-JUN-11   5096A-SOFTHOTEL           191.01      17.19       27.08           241.63
           41810983     30-JUN-11   571SA-HughesNet           160.00      14.40       22.67           202.39
           41824587     30-JUN-11   Actual-1000A-RO          1721.38       0.00      223.77          1997.65
           41826345     30-JUN-11   Actual-1215A-AD           938.93       0.00      122.03          1089.59
                                                            ==========  ========  ==============  ===========
                                          Sub Total         3180.17       31.59      418.02          3727.73
                                                            ==========  ========  ==============  ===========


JUL-2011   26201549     22-JUL-11   WYNREWARDS 5%              71.59       0.00        8.51            82.28
           41842602     31-JUL-11   5096A-SOFTHOTEL           191.01      17.19       23.85           238.40
           41843165     31-JUL-11   571SA-HughesNet           160.00      14.40       19.97           199.69
           41860267     31-JUL-11   Actual-1215A-AD           929.56       0.00      106.44          1064.35
           41859618     31-JUL-11   Actual-1000A-RO          1704.19       0.00      195.10          1951.26
```

Page 7 of 11

Report Date : 27-JUN-12

ITEMIZED STATEMENT

Customer No : 08129-87934-02-SUP
Address : 6220 McClellan Boulevard,Anniston,AL,36206,US
As of Date: 18-APR-2012

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| AUG-2011 | 26203935 | 22-AUG-11 | WYNREWARDS 5% | | 136.22 | 0.00 | 14.09 | 154.46 |
| | 41889125 | 31-AUG-11 | Actual-1000A-RO | | 1350.48 | 0.00 | 133.69 | 1525.36 |
| | 41887673 | 31-AUG-11 | Actual-1215A-AD | | 736.62 | 0.00 | 72.93 | 832.02 |
| | 41875895 | 31-AUG-11 | 5715A-HughesNet | | 160.00 | 14.40 | 17.26 | 196.98 |
| | 41873173 | 31-AUG-11 | 5096A-SOFTHOTEL | | 191.01 | 17.19 | 20.62 | 235.17 |
| | | | Sub Total | | 2574.33 | 31.59 | 258.59 | 2943.99 |
| SEP-2011 | 30624102 | 15-SEP-11 | SUPER8 TRAINING | | 150.00 | 13.50 | 14.94 | 183.42 |
| | 26207632 | 22-SEP-11 | WYNREWARDS 5% | | 27.55 | 0.00 | 2.43 | 30.82 |
| | 30629351 | 28-SEP-11 | GLOBAL CONFEREN | | 999.00 | 0.00 | 0.00 | 1029.47 |
| | 41924267 | 30-SEP-11 | Actual-1215A-AD | | 716.65 | 0.00 | 60.20 | 798.71 |
| | 41911924 | 30-SEP-11 | 5096A-SOFTHOTEL | | 191.01 | 17.19 | 17.50 | 232.05 |
| | 41922516 | 30-SEP-11 | Actual-1000A-RO | | 1313.87 | 0.00 | 110.35 | 1464.29 |
| | 41910714 | 30-SEP-11 | 5715A-HughesNet | | 160.00 | 14.40 | 14.65 | 194.37 |
| | | | Sub Total | | 3558.08 | 45.09 | 220.07 | 3933.13 |
| OCT-2011 | 26210451 | 22-OCT-11 | WYNREWARDS 5% | | 37.79 | 0.00 | 2.77 | 41.72 |
| | 41941139 | 31-OCT-11 | 5096A-SOFTHOTEL | | 191.01 | 17.19 | 14.27 | 228.82 |
| | 41938699 | 31-OCT-11 | 5715A-HughesNet | | 160.00 | 14.40 | 11.94 | 191.66 |
| | 41953574 | 31-OCT-11 | Actual-1215A-AD | | 656.29 | 0.00 | 44.95 | 721.25 |
| | 41955540 | 31-OCT-11 | Actual-1000A-RO | | 1203.19 | 0.00 | 82.42 | 1322.31 |
| | | | Sub Total | | 2248.28 | 31.59 | 156.35 | 2505.76 |
| NOV-2011 | 10578644 | 03-NOV-11 | GUEST SATISFACT | | 122.00 | 0.00 | 8.17 | 133.89 |
| | 10578642 | 03-NOV-11 | GUEST SRVCS TRA | | 160.00 | 0.00 | 10.72 | 175.60 |

Sub Total (AUG-2011): 3056.35 | 31.59 | 353.87 | 3535.98

Page 8 of 11

Report Date : 27-JUN-12

ITEMIZED STATEMENT

Customer No : 08129-87934-02-SUP
Address : 6220 McClellan Boulevard,Anniston,AL,36206,US
As of Date: 18-APR-2012

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
|  | 26214620 | 22-NOV-11 | WYNREWARDS 5% |  | 50.49 | 0.00 | 2.90 | 54.93 |
|  | 41969844 | 30-NOV-11 | 5096A-SOFTHOTEL |  | 191.01 | 17.19 | 11.15 | 225.70 |
|  | 41985767 | 30-NOV-11 | Actual-1215A-AD |  | 409.84 | 0.00 | 21.92 | 444.26 |
|  | 41967849 | 30-NOV-11 | 5715A-HughesNet |  | 160.00 | 14.40 | 9.33 | 189.05 |
|  | 41987305 | 30-NOV-11 | Actual-1000A-RO |  | 751.37 | 0.00 | 40.20 | 814.49 |
|  |  |  | Sub Total |  | 1844.71 | 31.59 | 104.39 | 2037.92 |
| DEC-2011 | 26218351 | 22-DEC-11 | WYNREWARDS 5% |  | 10.50 | 0.00 | 0.44 | 11.26 |
|  | 41999312 | 31-DEC-11 | 5715A-HughesNet |  | 160.00 | 14.40 | 6.63 | 186.35 |
|  | 42016870 | 31-DEC-11 | Actual-1000A-RO |  | 848.17 | 0.00 | 32.24 | 906.28 |
|  | 42017208 | 31-DEC-11 | Actual-1215A-AD |  | 462.64 | 0.00 | 17.58 | 494.33 |
|  | 42000169 | 31-DEC-11 | 5096A-SOFTHOTEL |  | 191.01 | 17.19 | 7.92 | 222.47 |
|  |  |  | Sub Total |  | 1672.32 | 31.59 | 64.81 | 1820.69 |
| JAN-2012 | 26219206 | 22-JAN-12 | WYNREWARDS 5% |  | 17.00 | 0.00 | 0.46 | 17.98 |
|  | 42029762 | 31-JAN-12 | 5096A-SOFTHOTEL |  | 190.96 | 17.19 | 4.69 | 219.19 |
|  | 42031701 | 31-JAN-12 | 5715A-HughesNet |  | 160.00 | 14.40 | 3.92 | 183.64 |
|  | 42049133 | 31-JAN-12 | Actual-1215A-AD |  | 507.87 | 0.00 | 11.43 | 534.79 |
|  | 42047309 | 31-JAN-12 | Actual-1000A-RO |  | 931.10 | 0.00 | 20.95 | 980.45 |
|  |  |  | Sub Total |  | 1806.93 | 31.59 | 41.45 | 1936.05 |
| FEB-2012 | 26222777 | 22-FEB-12 | WYNREWARDS 5% |  | 19.75 | 0.00 | 0.23 | 20.59 |
|  | 42077125 | 29-FEB-12 | Actual-1000A-RO |  | 327.43 | 0.00 | 2.62 | 340.04 |
|  | 42062991 | 29-FEB-12 | 5096A-SOFTHOTEL |  | 240.56 | 18.05 | 1.75 | 227.03 |
|  | 42063340 | 29-FEB-12 | 5715A-HughesNet |  | 160.00 | 14.40 | 1.40 | 181.12 |
|  | 42077676 | 29-FEB-12 | Actual-1215A-AD |  | 178.00 | 0.00 | 1.43 | 185.46 |

Report Date : 27-JUN-12

ITEMIZED STATEMENT
----------------

Customer No  : 08129-87934-02-SUP
Address :      6220 McClellan Boulevard,Anniston,AL,36206,US
As of Date:    18-APR-2012

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| MAR-2012 | 30672915 | 15-MAR-12 | GLOBAL CONFEREN | | 100.00 | 0.00 | 0.00 | 103.05 |
| | 26225697 | 22-MAR-12 | WYNREWARDS 5% | | 31.50 | 0.00 | 0.00 | 32.37 |
| | 42093128 | 31-MAR-12 | 5096A-SOFTHOTEL | | 200.56 | 18.05 | 0.00 | 223.64 |
| | 42092906 | 31-MAR-12 | 5715A-HughesNet | | 160.00 | 14.40 | 0.00 | 178.41 |
| | 42110266 | 31-MAR-12 | Accrual-1000A-R | * | 803.39 | 0.00 | 0.00 | 821.87 |
| | 42111064 | 31-MAR-12 | Accrual-1215A-A | * | 438.21 | 0.00 | 0.00 | 448.29 |
| | | | Sub Total | | 1733.66 | 32.45 | 7.43 | 954.26 |
| | | | | | 886.34 | 32.45 | 7.43 | 954.26 |
| | | | Sub Total | | 1733.66 | 32.45 | 0.00 | 1807.63 |
| APR-2012 | 10600803 | 05-APR-12 | GUEST SATISFACT | | 75.00 | 0.00 | 0.00 | 76.54 |
| | 10600856 | 05-APR-12 | GUEST SRVCS TRA | | 160.00 | 0.00 | 0.00 | 163.28 |
| | 30678937 | 06-APR-12 | AUDIT ADVERTISI | | 96.69 | 0.00 | 0.00 | 98.63 |
| | 30678936 | 06-APR-12 | AUDIT ROYALTY | | 177.27 | 0.00 | 0.00 | 180.82 |
| | 30678941 | 06-APR-12 | AUDIT INTEREST | | 58.84 | 0.00 | 0.00 | 60.01 |
| | 42133105 | 30-APR-12 | 5715A-HughesNet | | 160.00 | 16.00 | 0.00 | 177.41 |
| | 42133272 | 30-APR-12 | Accrual-1215A-A | * | 304.14 | 0.00 | 0.00 | 306.57 |
| | 42139642 | 30-APR-12 | Accrual-1215A-R | * | 557.59 | 0.00 | 0.00 | 562.05 |
| | 42135179 | 30-APR-12 | 5096A-SOFTHOTEL | | 200.56 | 20.06 | 0.00 | 222.38 |
| | | | Sub Total | | 1790.09 | 36.06 | 0.00 | 1847.69 |
| | | | Grand Total | | 74429.82 | 817.89 | 13742.33 | 91238.55 |

Page 10 of 11

Requested By: Indardaye Christian

Report Date : 27-JUN-12

ITEMIZED STATEMENT
-----------------

* Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.

******** END OF REPORT ********

## DE-IDENTIFICATION PROCEDURES

You must complete each of the following within 10 days after the Termination Date:

1.  Remove, replace or cover with an opaque cover the primary Facility signage.

2.  Remove all interior signage that contains Super 8 Marks.

3.  Change advertising billboards to remove Super 8 Marks.

4.  Stop answering Facility telephone as Super 8 guest lodging facility.

5.  Remove Super 8 name and Marks from any domain name, advertising and brochures.

6.  Return to us all confidential operations and training manuals.

7.  Remove the Super 8 name and Marks from the following items:

| | |
|---|---|
| Stationery, pads and pens | Soap/shampoo |
| Directories and brochures | Key tags |
| Business cards | Credit card imprinter |
| Folios and registration cards | Laundry bags |
| Do-not-disturb cards | Name tags/uniforms |
| Comment cards | Ice buckets/trays |
| Telephone plates | Ashtrays/matches |
| Telephone dialing instructions | Plaques |
| TV channel ID plates | Guest checks/receipts |
| Rate/law cards | Menus |
| Door signage | |

8.  Paint over or remove any distinctive Super 8 trade dress, paint schemes or architectural features.

9.  It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Super 8 facility.

10. Our quality assurance inspectors will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

UPS CampusShip: Shipment Receipt                                                    Page 1 of 1

 **Shipment Receipt**

**Transaction Date: 28 Jun 2012**        **Tracking Number:**        1Z22445X0291004928

---

**1  Address Information**

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Mountain 1st Bank & Trust | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Mountain 1st Bank & Trust | Dayna Brewer | Dayna Brewer |
| 101 JAck Street | 22 Sylvan Way | 22 Sylvan Way |
| HENDERSONVILLE NC 287922952 | Parsippany NJ 07054 | Parsippany NJ 07054 |

---

**2  Package Information**

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1. Letter | UPS Letter | | Reference # 1 - 006-1696 |

---

**3  UPS Shipping Service and Shipping Options**

| Service: | UPS 2nd Day Air |
|---|---|
| Guaranteed By: | End of Day Monday, Jul 2, 2012 |
| Shipping Fees Subtotal: | 13.85 USD |
| Transportation | 12.10 USD |
| Fuel Surcharge | 1.75 USD |

---

**4  Payment Information**

Bill Shipping Charges to:                    Shipper's Account 22445X

**A discount has been applied to the Daily rates for this shipment**

| Total Charged: | 13.85 USD |
|---|---|
| Negotiated Total: | 5.52 USD |

**Note: Your invoice may vary from the displayed reference rates.**
* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

UPS CampusShip: Shipment Receipt                                                    Page 1 of 1

 **Shipment Receipt**

**Transaction Date:** 28 Jun 2012          **Tracking Number:**          1Z22445X0291241314

| **1** | **Address Information** |

| Ship To: | Ship From: | Return Address: |
| Sainath LLC | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Mr. Bhavin Patel | Dayna Brewer | Dayna Brewer |
| 1813 Crestwood Boulevard | 22 Sylvan Way | 22 Sylvan Way |
| JEFFERSON PARK AL 352102031 | Parsippany NJ 07054 | Parsippany NJ 07054 |

| **2** | **Package Information** |

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1.  Letter | UPS Letter | | Reference # 1 - 006-1696 |

| **3** | **UPS Shipping Service and Shipping Options** |

| Service: | UPS 2nd Day Air |
| Guaranteed By: | End of Day Monday, Jul 2, 2012 |
| Shipping Fees Subtotal: | 15.63 USD |
| Transportation | 13.65 USD |
| Fuel Surcharge | 1.98 USD |

| **4** | **Payment Information** |

Bill Shipping Charges to:                              Shipper's Account 22445X

**A discount has been applied to the Daily rates for this shipment**

| Total Charged: | 15.63 USD |
| Negotiated Total: | 5.52 USD |

**Note: Your invoice may vary from the displayed reference rates.**
\* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.